# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**CIVIL ACTION NO. 2:17-CV-13278 (WOB-DRG)**

**FREDRICK FREEMAN**                                           **PETITIONER**

**VS.**                    **MEMORANDUM OPINION AND ORDER**

**PAT WARREN**                                                 **RESPONDENT**

## INTRODUCTION

This matter is before the Court on Petitioner Fredrick Freeman's second or successive habeas petition brought pursuant to 28 U.S.C. § 2254 (the "Petition"). The import of the procedural posture of this case cannot be overstated, and it is, in fact, determinative. For this reason, the Court summarizes it now.

It comes as no surprise, and is not disputed by the parties, that this Court's review of Freeman's Petition is limited by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the legislation Congress enacted governing a district court's review of habeas petitions. AEDPA provides procedural requirements a petitioner must satisfy before the Court can consider the merits of any petitioner's claim. It is further undisputed that these hurdles are even higher for a second or successive habeas petition.

This Court is confined to review first whether Freeman has satisfied these procedural requirements before it can consider the merits of Freeman's claims. Thus, this Court may not independently analyze whether it believes Freeman's state-court trial was unfair and base its decision on this opinion. In fact, AEDPA prohibits the Court from engaging in any merits analysis—unless and until Freeman satisfies the initial AEDPA procedural hurdles.

For the reasons set forth below, this Court concludes that Freeman has failed to satisfy the procedural hurdles imposed by AEDPA, and it therefore **DENIES** the Petition.

<u>**PROCEDURAL BACKGROUND**</u>

This case's procedural history is lengthy, beginning in 1986, but pertinent to understanding the scope and limits of this Court's review. Thus, the Court will dispense with its usual practice of first reciting the factual background, and instead it will provide the facts as necessary throughout its analysis.

**A.      Freeman's Conviction and Subsequent State Court Proceedings**

On November 5, 1986, at around 9:00 a.m., Scott Macklem was shot and killed in a parking lot at St. Clair Community College in Port Huron, Michigan. Although no one actually witnessed the murder, several witnesses saw a man in the parking lot where the murder occurred and then one who appeared to be driving away from where Macklem fell after being shot. Ultimately, the police arrested Freeman for Macklem's murder. Freeman's ex-girlfriend was dating Macklem at the time he was murdered, and the prosecution's theory was that Freeman murdered Macklem out of jealousy. Freeman's primary defense was an alibi defense--that he was in Escanaba, Michigan, hundreds of miles away, at the time of the murder. As previous courts addressing Freeman's petitions have recognized, there was no direct evidence tying Freeman to the scene. The prosecution's strongest evidence was the testimony of two witnesses who identified Freeman out of a photographic line up, and whose descriptions were consistent with the testimony of other witnesses from the scene. These eye witnesses also independently identified him at trial. This testimony will be addressed in detail below.

Freeman's trial was lengthy, and both sides presented numerous witnesses. Ultimately, on May 18, 1987, a jury convicted Freeman of first-degree murder. The trial court sentenced Freeman to life in prison without the possibility of parole on August 3, 1987.

Freeman timely appealed his conviction, which was denied by the appellate court, and the Michigan Supreme Court ultimately denied Freeman's application for leave to appeal, thus ending his direct appeal. Freeman then filed his first motion for relief from judgment, which the trial court denied on January 11, 2005. The Michigan Supreme Court denied leave to appeal on January 30, 2006.

## B.    Freeman's First Federal Habeas Corpus Petition

Freeman then turned to the federal courts for relief. Although his petition was time-barred, the district court granted relief finding that Freeman had provided sufficient new evidence to undermine the confidence in the verdict, which equitably tolled the statute of limitations and excused his procedural defaults. *Freeman v. Trombley*, No. 2:07-CV-10350, 2011 WL 61722 (E.D. Mich. Jan. 7, 2011). The "new" evidence Freeman presented included evidence that: (1) his trial counsel was addicted to drugs at the time he represented Freeman; (2) an affidavit by Freeman that he wanted to testify, but his counsel prevented him from doing so; (3) an affidavit from an alibi witness (Freeman's girlfriend at the time of the murder) that she was with him at the time of the murder; and (4) evidence that the jailhouse informant, to whom Freeman had allegedly confessed while both were in jail, had recanted his trial testimony. Having excused all procedural defaults, the trial court addressed the merits of Freeman's claims, finding that Freeman was entitled to relief on three of his claims. The district court granted Freeman's petition.

On May 18, 2012, the Sixth Circuit reversed this decision. *Freeman v. Trombley*, 483 F. App'x 51 (6th Cir. 2012). The Sixth Circuit concluded that Freeman did not meet his burden to

show he was entitled to equitable tolling because the evidence Freeman proffered as "new" was not, in that it had been available to Freeman well before the statute of limitations ran for him to file his petition.

The Sixth Circuit also rejected Freeman's argument that he was actually innocent, another ground on which Freeman could have established he was entitled to equitable tolling. In analyzing the district court's actual innocence ruling, the Sixth Circuit considered "'all the evidence, old and new, incriminating and exculpatory,' without regard to whether it would necessarily be admitted under rules of evidence." *Id.* at 56 (quoting *House v. Bell*, 547 U.S. 518 (2006)). The Court recognized that its role was to determine whether Freeman had demonstrated that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.* at 57 (quotations and citations omitted). The Sixth Circuit examined each of the pieces of "new" evidence Freeman offered to the trial court and ultimately rejected them.

The Court first addressed the evidence that trial counsel had been addicted to drugs and found that it did not support an ineffective assistance of counsel claim. The Court noted that defense counsel mounted a vigorous defense on Freeman's behalf. The Court also rejected Freeman's argument that trial counsel had prevented him from testifying, finding it to be insufficient evidence to establish an ineffective assistance of counsel claim. The Court found Freeman's self-serving affidavit years after the fact insufficient to rebut the presumption that the fact he did not testify was a knowing and voluntary waiver of a known right.

Next, the Sixth Circuit considered the affidavit of Michelle Woodworth, who was Freeman's girlfriend at the time (and pregnant with their child), and who averred that she would have testified that Freeman was with her the entire day of Macklem's murder. The Court noted that trial counsel had strategic reasons for not calling her, including that she initially lied to the

police that Freeman was not living with her, that her testimony could be used to support the prosecution's witnesses, and that several other independent witnesses would testify in support of Freeman's alibi defense. The Court recognized that Woodworth's testimony became more important when, on rebuttal, the prosecution offered the theory that Freeman could have made the trip in a small plane, thus casting doubt on the alibi witnesses Freeman had offered. But the Court still found that trial counsel's decision not to call Woodworth was strategic, and further, the Court concluded that her affidavit could not be found to clearly demonstrate Freeman's innocence, because the jury clearly rejected the testimony of Freeman's other disinterested alibi witnesses. The Court determined that the jury would have been just as likely, if not more likely, to reject Woodworth's testimony.

Having rejected each of Freeman's arguments in support of actual innocence, the Sixth Circuit concluded that Freeman had failed to overcome the procedural defaults in his case and that the trial court had thus erred in analyzing the merits of his claim. The Sixth Circuit reversed the trial court's order granting Freeman's first petition.

## C.    Newly Discovered Evidence

On January 31, 2008, during the pendency of Freeman's first habeas petition, his private investigator discovered the five original mugshot photos used by the prosecution in the photographic lineups conducted with the only two witnesses to have identified Freeman and connected him to the scene of the murder. (Doc. 1 at 2-3.) On April 28, 2008, the investigator also viewed the People's Exhibit 26, which consisted of cropped versions of the original lineup photos shown to the jury during trial. The prosecution presented the People's Exhibit 26 to the jury as a purported replica of the photos from which the witnesses made their identifications. (*Id.* at 3.)

Freeman's present Petition is based on these photographs. He contends that the original photographic lineup was unduly suggestive because his photograph was different from the fillers' photographs in several ways. He further argues that People's Exhibit 26, as presented to the jury, cropped out several of the suggestive elements that were present in the initial lineups presented to the witnesses, thus misleading the jury as to the reliability of the initial identifications. The Court will discuss these alleged differences in detail in its analysis below.

On January 20, 2012, Freeman filed a second motion for relief from judgment in the state courts, arguing that based on this newly discovered evidence, relief was appropriate. (*Id.*) The state trial court denied the motion without evidentiary hearing, but the Michigan Supreme Court remanded for an evidentiary hearing. The hearing was held on March 12 and 13, 2014, and the state court accepted testimony from several witnesses, including the original prosecutor, the original defense attorney, and an expert on identifications.

On November 10, 2014, the state court denied relief. The Michigan Court of Appeals affirmed on different grounds not relevant to this Court's present inquiry and analysis, and the Michigan Supreme Court denied leave to appeal, ending the state court proceedings on Freeman's second collateral appeal on September 29, 2016.

**E. The Sixth Circuit Grants Motion for Second or Successive Habeas Petition**

In March 2017, as required by the AEDPA, Freeman sought the Sixth Circuit's approval to file a second or successive habeas petition. (Doc. 1-14, Sixth Circuit Decision, at 4.) In that petition, Freeman sought to raise a *Brady* claim and an ineffective assistance of counsel claim, as well as a freestanding claim of actual innocence. (*Id.*)

As required when analyzing a request to file a successive habeas petition, the Sixth Circuit examined whether Freeman made a *prima facie* showing that the petition contained a new claim that relied upon new facts that "could not have been discovered previously through the exercise of

due diligence" and that, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." (*Id.*) (quoting 28 U.S.C. § 2244(b)(2), (b)(3)(C)).

The Sixth Circuit concluded that Freeman had presented new facts that could not have previously been discovered and that those facts would be sufficient to grant his habeas petition. First, the court concluded that Freeman could not have discovered the uncropped photographs through due diligence because the record demonstrated that he had been diligently attempting to get them for years, and despite the prosecution allegedly making them available through its open file policy, they were not discovered until 2008 by Freeman's private investigator. (*Id.* at 5.) The court concluded that Freeman's inability to obtain the photographs called into question the completeness of the prosecution's file. (*Id.*) The court further concluded that Freeman's showing as to the fact that the uncropped photographs were "new" was satisfactory for purposes of both his *Brady* and ineffective assistance of counsel claims.

Next, the court considered whether Freeman satisfied his burden to show that his allegations and supporting documentation "warrant[ed] a fuller exploration in the district court" as to whether "absent the alleged constitutional violations, no reasonable juror would have found him guilty of Macklem's murder." (*Id.*) (internal quotation and citation omitted). The court found that Freeman had made this *prima facie* showing of a constitutional violation.

As to his *Brady* claim, the court found that the uncropped photographs at least had some impeachment value because they had several differences between Freeman's photos and those of the police fillers, differences which were not clear in the composite exhibit shown to the jury. (*Id.* at 7.) Freeman submitted the testimony of an eyewitness expert who classified the photo array as

highly suggestive and opined that the differences could have affected the reliability of the "eyewitness testimony." (*Id.*) The court further concluded that the fact that the prosecution's file did not contain the uncropped photos showed that the prosecution suppressed them, even if inadvertently. (*Id.*) Finally, the court found Freeman had satisfied his initial burden of showing prejudice because, given the evidence against him at trial, evidence casting doubt on the testimony of the only two individuals to place Freeman in Port Huron, when nine other witnesses placed him hundreds of miles away, could have affected the jury's final verdict. (*Id.*)

As to his ineffective assistance of counsel claim, for similar reasons, the court concluded that Freeman made his initial prima facie showing. The court concluded that, given the importance of the witnesses' identification to the prosecution's case, further exploration was warranted as to whether counsel's behavior as to these photographs, specifically whether he failed to use them, failed to attempt to suppress them, or failed to use them to impeach the witnesses, constituted ineffective assistance of counsel. (*Id.* at 7-8.)

The court further found that Freeman had made an adequate initial showing that, had he had access to the original, uncropped photographs at trial, no reasonable factfinder would have found him guilty. (*Id.* at 8.) The court noted that, although this standard was not difficult to meet, there was no direct evidence linking Freeman to the crime, and only two witness placed him at the scene—the same two who relied upon the potentially tainted photo array. (*Id.*) Moreover, there were other facts which called into question the strength of the witnesses' identification of Freeman. (*Id.*)

Finally, the court concluded that Freeman could not pursue a freestanding actual innocence claim because such a claim was not recognized under habeas law. (*Id.* at 9.)

**F.       Freeman's Habeas Petition Before This Court**

Freeman now presents two claims for this Court's review.  First, he alleges the existence

of a "*Brady* violation for the prosecution's failure to disclose the favorable and material evidence

of the original, uncropped photographs used in the photo lineups viewed by the two witnesses."

(Doc. 1, Habeas Petition, at 9.)  Second, and in the alternative, he alleges an "ineffective assistance

of counsel claim for failing to discover or use the original photographic array, if they were

available to trial counsel before trial."  (*Id.*)

## DISCUSSION

As noted at the outset, before this Court can consider the merits of Freeman's claims

identified above, Freeman must satisfy AEDPA's initial procedural requirements.  So, before the

Court can consider any other issue, it must determine whether Freeman has satisfied the

requirements of Section 2244(b)(2)(B), as Freeman admits.  Only if he does that can the Court

consider any other procedural issues implicated by his Petition, and then, if those are satisfied, the

Court can ultimately consider the merits of Freeman's Petition.

**A.       Section 2244(b)(2)(B) Standard**

Although the Sixth Circuit's previous order concluded that Freeman had made a *prima*

*facie* showing to satisfy the requirements of section 2244(b)(2)(B), the parties agree that this

Court's first step in its analysis of a successive habeas petition is to determine whether Freeman

has *actually satisfied* the requirements of section 2244(b)(2)(B).[1]  28 U.S.C. § 2244(b)(4); *Tyler*

*v. Cain*, 533 U.S. 656, 661, n.3, (2001) (recognizing that "to survive dismissal in district court, the

applicant must actually "sho[w]" that the claim satisfies the [2244(b)(2)(B) standard").

---

[1] Freeman contends that the fact that the Sixth Circuit took several months to render its decision entitles the opinion
to deference.  The Court does not accept that the mere length of time taken to render the opinion entitles an opinion
to more deference, and the law is clear that this Court must independently examine that a petitioner has satisfied the
requirements of 2244(b)(2)(B).

To satisfy the requirements of section 2244(b)(2)(B), Freeman must show: (1) diligence, *i.e.*, that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence," 28 U.S.C. § 2244(b)(2)(B)(i), and (2) that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).

Although Freeman must satisfy both elements of this test, because the Court concludes that the second inquiry is determinative, it will analyze only that element, thus assuming diligence for purposes of this opinion.

## B.  Actual Innocence under Section 2244(b)(2)(B)(ii)

The legal standard for section 2244(b)(2)(B)(ii) has been characterized as an "actual innocence" standard. *See e.g., Caldwell v. Lafler*, No. 4:04-CV-133, 2008 WL 907536, at * 4–5 (W.D. Mich. Mar. 31, 2008); *Lott v. Bagley*, No. 1:04 CV 822, 2007 WL 2891272, at * 14 (N.D. Ohio Sept. 28, 2007).  That said, the standard set forth in section 2244(b)(2)(B)(ii) is different from the actual innocence standard provided in *Schlup v. Delo*, 513 U.S. 298 (1995).  Another court in this Circuit has explained the difference as follows:

> In *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Court held that "a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition." *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (citing *Schlup*, 513 U.S. at 317). Such a claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Souter*, 395 F.3d at 588–89 (quoting *Schlup*, 513 U.S. at 315).

> To satisfy the *Schlup* actual innocence standard, a petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 327). Moreover, "actual innocence means factual innocence, not mere legal insufficiency." *Souter*, 395 F.3d at 588–89 (quoting

*Schlup*, 513 U.S. at 327). Such a claim "requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 324). The *Schlup* Court further cautioned that "the actual innocence exception should remain rare and only be applied in the extraordinary case." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 321).

**In enacting the Anti–Terrorism and Effective Death Penalty Act (AEDPA), Congress "adopted a more stringent actual innocence exception" in the context of second or successive petitions such as [petitioner's]**. *Souter*, 395 F.3d at 590 [footnote omitted]. First, Petitioner must establish that the factual basis for his [successive habeas] claim[s] could not have been discovered previously through the exercise of due diligence. *See* 28 U.S.C. § 2244(b)(2)(B)(i). This was not a requirement in the *Schlup* actual innocence analysis. Petitioner must also demonstrate not merely that "it is more likely than not" that no reasonable juror would have found him guilty, but instead Petitioner must establish **by clear and convincing evidence** that, but for constitutional error, no reasonable factfinder would have found him guilty. *See* 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added). The Supreme Court has interpreted this provision as requiring a petitioner to demonstrate by clear and convincing evidence that he is innocent of the crimes for which he was convicted. *Calderon*, 523 U.S. at 558 ("a federal court can consider a claim presented in a second or successive application only if the prisoner shows, among other things, that the facts underlying the claim establish his innocence by clear and convincing evidence").

*Caldwell*, 2008 WL 907536 at * 4–5 (emphasis added). *See also Case v. Hatch*, 731 F.3d 1015, 1037 (10th Cir. 2013) (observing that "[t]he *Schlup* standard appears to be more forgiving than subparagraph [§ 2244(b)(2)](B)(ii), since it allows a broader range of evidence to be evaluated by the court—old and new; admissible and inadmissible").

So, in analyzing whether Freeman has satisfied the "actual innocence" prong of 2244(b)(2)(B)(ii), this Court is "to look to the evidence the jury heard at trial, augmented by [the] evidence [linked to the constitutional violations] and then make a probabilitstic determination about what reasonable, properly instructed jurors would do." *Davis v. Bradshaw*, No. 1:14CV2854, 2016 WL 8257676, at *20 (N.D. Ohio June 16, 2016), *report and recommendation adopted*, No. 1:14 CV 2854, 2017 WL 626138 (N.D. Ohio Feb. 15, 2017), *aff'd*, 900 F.3d 315 (6th

Cir. 2018) (internal quotations and citations omitted). "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

Given this framework, this Court will now summarize the evidence adduced at trial, detail the "newly discovered evidence" Freeman provides with his Petition, and then analyze the likely impact this new evidence would have on reasonable jurors in light of the evidence presented at trial. *See id.*

### 1. The Evidence Adduced at Trial

As noted above, Freeman's trial occurred during several weeks and both sides presented numerous witnesses. Indeed, the trial transcript contains more than 2000 pages. The evidence presented at trial can best be summarized as follows.

Scott Macklem was killed on November 5, 1986 in the parking lot of St. Clair Community College in Port Huron, Michigan, by a single shot from a shotgun. *Freeman*, 483 F. App'x at 53. No one witnessed the murder and no physical evidence linked Freeman to the murder. *Id.* The prosecution's theory was that Freeman killed Macklem out of jealousy, because Freeman's ex-girlfriend, Crystal Merrill, went back to Macklem, her previous boyfriend, after Freeman's relationship with her ended. *Id.* However, Freeman and Merrill had dated for a period of only six to eight weeks.

The prosecution elicited testimony from Merrill about her relationship with Macklem, other men, and ultimately Freeman for a six to eight-week period prior to her rekindling her relationship with Macklem. Merrill testified in some detail about Freeman's alleged association with a ninja organization, his alleged use of certain ninja weapons, and his alleged rape of her on

two separate occasions. The prosecution sought to prove that Freeman was a controlling and abusive individual who ultimately killed Macklem because he could no longer have Merrill.

In addition to Merrill's testimony, the prosecution offered evidence of phone conversations between Merrill and Freeman before and after the murder, during which he was purportedly controlling and trying to obtain details about the murder, as well as focused on whether Macklem's murder had attracted press; the testimony of witnesses who placed Freeman at the scene at or about the time of the murder; and the testimony of a jailhouse detainee, who testified Freeman admitted to committing the murder. *Id.*

Freeman defended against these allegations by offering an alibi. *Id*. at 54. Freeman produced nine witnesses who testified they saw Freeman hundreds of miles away in Escanaba, Michigan, on the day of the murder. Testimony established the drive between Port Huron and Escanaba to be several hours such that, if the jury accepted the alibi witnesses' testimony, Freeman could not have made the drive to commit the murder. In rebuttal, the prosecution argued that Freeman could have flown from Escanaba to Port Huron in sufficient time to commit the murder. However, the prosecution offered no evidence that Freeman did, in fact, obtain a plane and fly. Additionally, the police never recovered the murder weapon, nor did they ever locate the car that was seen on the college campus (allegedly driven by Freeman) on the day of the murder.

The prosecution offered the testimony of several witnesses who were at St. Clair Community College on the day of the murder. These individuals testified to seeing a man fitting the same general description at the college before and at the time of the murder. One of the detectives testified that the eye-witness testimony was the primary basis for Freeman's arrest warrant. (Doc. 8-11 at 58.) Only two of these witnesses, Rene Gobeyn and Richard Krueger, actually identified Freeman pretrial and at trial. A third witness, Kathleen Ballard, offered a

description of the witness that was consistent with that offered by the other witnesses, but never

definitively identified Freeman.  The testimony of these witnesses is critical to this Court's analysis

and will be discussed in detail.

### a.    *Rene Gobeyn*

At trial, Rene Gobeyn ("Gobeyn") testified that he heard what sounded like a shot and a

couple of screams.  (Doc. 8-11 at 172.)  He testified it sounded like someone was joking around,

and so he initially thought little of it.  (*Id.*)  In the direction from where the sound came, Gobeyn

observed a small gold colored car driving in his direction.  (*Id.* at 173.)  Because he got a "weird

feeling," Gobeyn carefully observed the driver of the car.  (*Id.*)  According to Gobeyn, the driver

had his head pointed down, but his eyes pointed up.  (*Id.* at 174.)  At trial, Gobeyn described the

driver as a

> white male. He was approximately 20-25 years old.  He had a thin—it was—he had
> a full mustache, but the beard was thinner.  . . . he had dark hair that was sticking
> out underneath the hat he was wearing.  He was wearing a dark blue or black hat
> with a red trim, looked like a ski mask with the hole for the mouth, looked like there
> was a red trim around that. . . . . His face was exposed.

(*Id.* at 175.)  Gobeyn also described that the driver was wearing a "green drab kind of army-style

jacket, and just the hat."  (*Id.* at 176.)  Gobeyn testified that, when the driver drove by, it looked

like he was grinning or laughing.  (*Id.* at 216).  Gobeyn testified that he also looked at the license

plate.  (*Id.* at 177.) After seeing the car drive away, he continued to class, and he saw an empty

parking space next to where Macklem was laying. (*Id.* at 179.)

Later, Gobeyn went to the police department to review a photo lineup.  (*Id.* at 181.)  Gobeyn

testified the photo array had five photos in it, and he was able to identify the person he saw driving

the car.  (*Id.*)  He also testified at trial that the People's Exhibit 26 as offered at trial was

recognizable and that he saw the photos from the People's Exhibit 26 previously in the police

photo lineup.  (*Id.*)  Gobeyn identified the photo he picked in the photo array.  (*Id.* at 182.)  He then testified that he came back to the police department to participate in an in-person lineup and identified the person he saw driving the car the morning of Macklem's murder.  (*Id.*)

However, Gobeyn's identification was not without its weaknesses.  First, Gobeyn admitted that he knew two of the five people in the in-person lineup. (*Id.* at 183.)  Second, the day of the murder, Gobeyn pointed out someone in the parking lot that resembled the person he saw driving the car that morning—someone who was not Freeman.  (*Id.* at 195.)  Additionally, by his own admission, Gobeyn could not see much of the driver's face because the driver had the hat pulled down on his forehead, and the jacket's collar was up.  (*Id.*at 201.)  Finally, following much police investigation, it was determined that Gobeyn's recollection as to the plate on the car was incorrect. (*Id.* at 213.)

Nonetheless, Gobeyn made an independent identification at trial.  The prosecutor asked Gobeyn: "[r]ecognizing Mr. Gobeyn, that there is a difference between the ability to describe someone, and the ability to recognize someone, from all that you saw that day during this encounter, do you feel that you would be able to recognize that person should you see him again?" (*Id.* at 176-77.)  Gobeyn responded that he could and then identified Freeman as the driver.  (*Id.* at 177.)

### b.    *Richard Krueger*

Richard Krueger also identified Freeman.  Krueger testified that he pulled into the community college's parking lot at 8:00 a.m. on the morning of the murder, and he saw someone standing in the shrubbery and bushes.  (Doc. 8-12 at 55.)  Krueger made eye contact with the individual, who then tried to nonchalantly go into one of the buildings but could not because it was an exit only door.  (*Id.* at 57.)  The individual then ran around the building, out of sight. (*Id.*)

Krueger described the individual as being male, in his twenties, with a beard, wearing a green fatigue jacket, zipped up to the top, and he was wearing a watch cap, which is a knit cap without a bill. (*Id.* at 58-59.) Krueger described the man as being very intense.

Two days later, Krueger looked at a photo lineup. (*Id.* at 61-62.) During trial, Krueger was shown the People's 26, and the prosecutor asked "if the photographs in this exhibit number 26 appear to you to be the, perhaps enlarged versions, but the same faces and the same photographs as those that you saw?" (*Id.* at 62.) Krueger responded "I wasn't paying as much attention to the ones that weren't the full, you know, the face as you – the one that may be the face." (*Id.*) Krueger then described how he made the identification at the photo lineup:

> A. I did this (indicating), so that I would ignore the hair totally, and here was the watch cap as far as I was concerned.
>
> Q. Did that with each of the photographs you went through?
>
> A. I just went along and the eyes and the face and features and profile look –
>
> Q. Looked the same?
>
> A. The same.

(*Id.* at 63.) Krueger picked Freeman out of the photo lineup.

A week or so later, Krueger participated in an in-person lineup at the department. (*Id.* at 63.) He could not feel confident about an identification at that time, and he described discomfort during the process because of the heat, lights, and the presence of lots of people. (*Id.* at 63-64.) In fact, he did not pick Freeman out of the lineup but instead picked out someone else. (*Id.* at 76.) Defense counsel examined him in detail on this misidentification:

> Q. Did you not, in fact, pick out a subject by the name of James Loxton in position number six, and you based it on your particular look of this person's eyes, the beard, and his darker complex?

A. . . . I would say that it would be the person on the end to the far right. Now, I don't know his name. No one shared that with me.

Q. And you don't recall seeing the defendant in that lineup?

A. My—my feeling on it was that somebody's mother couldn't have picked him out in that lineup.

(*Id.* at 79.)

Krueger further explained why the lineup procedure made him uncomfortable:

A. It seemed—first of all, it seemed inappropriate that I had to have the defense attorney there when I was in the lineup, watching a lineup. The second thing was, it was challenging me to the fact that he said, how the – now I cannot quote, I'm paraphrasing, please. He said well, how were the, like, how were the pictures presented to you? Well, I had indicated they were pictures, and he said was one of them kind of, you know, accented or, you know, drawn forward. To me that –it started to kind of get a little, you know, uneasy, because I – the five photographs were there. I picked out a photograph. That's – that was what I had stated.

(*Id.* at 83.)

Even though Krueger did not identify Freeman during the in-person lineup, he did identify Freeman at the preliminary hearing as the person he saw that morning in the parking lot. And he again independently identified Freeman at trial:

Q. And I want to ask you further, whether based on what you saw in the parking lot that morning . . . and the contact that you had visually between one minute past eight and nearly a quarter past eight, do you feel that if you saw that individual again you would be able to recognize him?

A. Yes, I feel that way.

Q. Is that person in court today?

A. He is.
. . .

Q. And the person is seated here at the defense table, is that correct?

A. That's correct.

Q. Is that the person that you saw in the parking lot that morning?

A. To the best of my knowledge that's the person I saw in there.

(*Id.* at 66.)

### c. *Kathleen Ballard*

Kathleen Ballard was also in the parking lot at the time of Macklem's murder, and she testified she heard what was ultimately determined to be the shot and that she heard someone scream. (Doc. 8-12 at 21.) She thought it was a joke and did not believe anything was seriously wrong. (*Id.*) She continued toward class. She observed a small, reddish tan colored car back out of a spot and begin driving towards the exit, passing by her. (*Id.* at 23.) She could see the driver was a white male, college-aged, and as he passed by her, she described that he attempted to hide his face. (*Id.* at 24.) She could not see his face clearly but thought she saw him laughing, like he had just played a joke. (*Id.* at 25.) She thought the car was driving faster than it should have been. (*Id.* at 42.)

A week and a half after the murder, Ballard participated in an in-person lineup. (*Id.* at 31-32.) The lineup had five or six individuals, and Ballard could not identify one as the driver of the car. (*Id.* at 32.) At trial, Ballard testified that one of the people in the lineup seemed kind cocky or like he was not taking the lineup seriously, and Ballard connected that behavior to the driver's behavior. (*Id.*) Ballard described that the "body language and the attitude" were the same. (*Id.* at 33.) Ballard then connected that behavior to Freeman:

> Q. And I would ask you further, Miss Ballard, realizing that it may be possible for some people to say I'm positive a hundred percent, that's the same person, and it may also be possible to say although I'm not a hundred percent positive, that there are comparisons or there are similarities or there are connections, physically, I would ask you whether the defendant charged in this case, Frederick Freeman, in fact, resembles the person that you saw driving that car in the parking lot?
>
> A. Yes, he does.

Q. Are there any things that turn out to be differences? Are there any – any things that are not consistent or that are different from the appearance of the person that you saw driving that car and the appearance of this defendant in court, Frederick Freeman?

A. No.

Q. Does he, in fact, appear to be the same person?

A. Yes.

(*Id.* at 34.)

Ballard admitted on cross that, at the preliminary examination, she testified that she could not identify the driver. (*Id.* at 35.) She also appeared to doubt her identification. (*Id.* at 48) ("I did not see enough of the driver to positively—I didn't have any picture in my mind even to pick out anyone in the lineup and I never positively identified anyone.")

### 2. *Brady* Evidence

Next, the Court considers the evidence Freeman contends was wrongly kept from the jury as a result of the alleged constitutional error. *Davis*, 2016 WL 8257676, at *25. Section 2244(b)(2)(B) "imposes a strict standard restricting the kinds of evidence that federal courts may consider when entertaining a state prisoner's successive-petition claim." *Case*, 731 F.3d at 1035. Specifically, "the inquiry under subparagraph (B)(ii) excludes any consideration of evidence not rooted in constitutional error at trial." *Id.* "The factual universe does not encompass new facts that became available only after trial and that are not rooted in constitutional errors occurring during trial." *Id.* at 1038.

Here, Freeman identifies the five original photographs used in the photographic lineup with Gobeyn and Krueger as being wrongfully withheld in violation of his constitutional rights. There is no dispute that these photographs contain differences that do not appear in the photographs

contained within the People's Exhibit 26, which was ultimately shown to the jury during trial. The

Sixth Circuit identified these differences as follows:

> Freeman's photo features a striped background while the others have solid
> backgrounds; Freeman's profile photo is of his left side, and the others are taken
> from the right; Freeman's body is facing forward in his profile shot, and the other
> profile photos show the men turned to the side; both of Freeman's photos include
> the police placard while the police fillers' photos only have the police placard in
> the forward-facing photos; only Freeman's placard bears the name of a city other
> than Port Huron; Freeman's front-facing and profile photos are separated by a white
> gap, and the others were joined with no gap; and Freeman's photograph bore the
> most recent date.

*In re: Fredrick Freeman*, No. 17-1280, at 6 (6th Cir. Oct. 2, 2017).

Freeman has also submitted expert evidence as to the differences of these photographs. In

March 2014, the state trial court held an evidentiary hearing on Freeman's claims pertaining to the

original photographs in conjunction with Freeman's motion for relief from judgment. At this

hearing, Freeman offered testimony from an expert in eyewitness identification, Dr. Jennifer

Dysart:

> At the evidentiary hearing, Freeman sought to introduce the testimony by a
> psychologist specializing in eyewitness identification, Jennifer Dysart. The
> prosecution objected, but the trial court allowed Freeman to call Dysart in an offer
> of proof. Dysart testified that the differences between Freeman's mug shot and the
> filler mug shots resulted in the differences drawing attention to him. Dysart opined
> that the cumulative effect of these differences could have affected the reliability of
> Gobeyn and Krueger's identifications. Dysart characterized the lineup as "highly
> suggestive." She further opined that the phenomenon of "mug shot commitment"
> made the initial identification most important. Ultimately, however, Dysart
> concluded that there was no way to know if the differences between the mug shots
> influenced Gobeyn and Krueger's identifications.

*People v. Freeman*, No. 311257, 2015 WL 4599481, at *3 (Mich. Ct. App. July 30, 2015).

Freeman specifically asked Dr. Dysart whether the jury would have recognized the photo

lineup containing the original, uncropped photographs as suggestive:

> Q. So, had Mr. Freeman's attorney had had enough information at trial to point out
> the differences between Exhibit 26 and the uncropped photographs used in the

original photo lineup, would the differences between People's Exhibit 26 and the uncropped photos have been obvious enough such that a jury would have recognized the uncropped photo array as suggestive?

A. That's a long question. I, I believe so, yes.

Q. Can you please explain why that's your opinion?

A. Well the the, the differences I think what they would recognize is that the suggestive elements, if you will, of the array that was viewed by the witnesses are no longer present in the – in People's Exhibit 26. And so I think it's correct that it may not take an expert to be able to recognize that there are substantial differences in People's Exhibit 26, which minimized the suggestiveness of the actual photo array that was viewed by the witnesses.

(Doc. 8-28 at 170.)

Dr. Dysart further opined that the jury was misled as to whether the original photographic

lineup was suggestive:

Q. In your professional opinion was the jury misled by the differences as to whether or not Mr. Freeman was selected out of a suggestive photo lineup?

A. Yes, I believe so.

Q. Why is that your opinion?

A. Because there was substantial differences in the two procedures essentially and the, the photo array that they viewed People's Exhibit 26 did not have any of the suggestive elements essentially that were really attributed, only attributed to Mr. Freeman during the original array.

(*Id.* at 180.)

The prosecutor from the trial, Robert E. Cleland, also testified at the hearing that defense

counsel was invited several times to review the file pursuant to his "open file" policy. Cleland

admitted that he used the People's Exhibit 26, rather than the individual mug shots, because he

believed the cropped photos were less prejudicial. *Freeman*, 2015 WL 4599481, at *3.

Freeman's counsel explored whether Cleland believed that counsel would have used the

original photos at trial, in an attempt to discredit the People's Exhibit 26:

Q Would you not have worried that if you presented People's Exhibit 26 to the jury Mr. Dean would stand up and say: These are misleading photos ladies and gentlemen of the jury. Here are the actual photos from which my client was picked out. Look at the significant differences between my client and the others. Wouldn't you have been worried about that?

A Absolute -

Q If he, if he -

A Absolutely not.

Q All right. So that would have been fine with you if Mr. Dean had stood up and said: This is a misleading exhibit ladies and gentlemen of the jury?

A And, and picked up these mug shots and showed them to the jury?

Q Yes.

A In turn?

Q Yes.

A Would I have been worried? I would have been worried in that event about ineffective assistance of counsel perhaps.

(Doc. 8-28 at 251.)

Freeman's trial counsel also testified at the hearing as to what his actions might have been

had he been aware of the original, uncropped photographs at the time of trial:

Dean also testified at the hearing and explained that, before trial, he was looking for ways to discredit the eyewitness identifications. . . . . As part of an offer of proof, Dean testified that if he had seen the individual photographs, it is unlikely that he would have objected to the use of exhibit 26. He was not even sure what objection would have been viable. Dean's focus was on attacking Gobeyn's identification because it was allegedly tainted by hypnosis. Dean believed that one of the witnesses was impeachable because he picked out the wrong person at the corporeal lineup. Dean also testified that "had he seen the photographs" he would not have been upset with the cropping and mounting to create exhibit 26 because, in his opinion, the objectionable attributes had been removed.

*Freeman*, 2015 WL 4599481, at *3-4.

Dean testified as to what he would have done if he had believed the witnesses were subjected to a suggestive lineup:

> Q So Mr. Dean, if the one witness you're concerned about Mr. Gobeyn had been subjected to a suggestive first identification procedure that would have concerned you, right?
>
> A Yes, sir. That's a fair statement.
>
> Q And then you would have tried to suppress Mr. Gobeyn's testimony on that basis, right?
>
> A Had I felt that I -- you're, you're right I would have.

(Doc. 8-29 at 37.)

### 3. Analysis

Upon careful consideration of the record, the Court cannot find that Freeman has satisfied his burden under section § 2244(b)(2)(B)(ii). In order to clear this procedural hurdle and satisfy section 2244(b)(2)(B)(ii), Freeman must show, by clear and convincing evidence, that ***all jurors*** would have found him innocent if they had been presented with the original, uncropped photographs. 28 U.S.C. § 2244(b)(2)(B)(ii); *Davis*, 2016 WL 8257676, at *20. So, the question for this Court becomes whether, if the jurors had been presented with these photographs and considered these photographs in addition to all other evidence presented at trial, they would have found Freeman innocent. *Davis*, 2016 WL 8257676, at *20. If the answer to this question is "yes," then Freeman has satisfied section 2244(b)(2)(B), and this Court may continue its analysis. If the answer is "no," the Court's analysis must end and Freeman's Petition must be denied.

It is undisputed that Krueger and Gobeyn were the only witnesses to see the photo lineup, initially identify Freeman from this lineup, and thus connect him to the scene. So, the question becomes whether the original photographs used in the lineup, and the fact that they are different from those actually presented to the jury in the People's Exhibit 26, would have undermined these

identifications so as to cause the jury to discredit them and the testimony of these witnesses. For the reasons that follow, the Court answers this question in the negative.

First, it is questionable whether counsel would even have shown these photographs to the jury. It is undeniable that showing the jury the original, uncropped photographs would have potentially been more damaging, because it would have revealed to the jury that Freeman had been arrested recently by a jurisdiction other than Port Huron. *See Gross v. Burt*, No. 06-10715-BC, 2008 WL 2478340, at *10 (E.D. Mich. June 16, 2008) (recognizing that an unedited mugshot was "somewhat prejudicial" because "it suggested, at a minimum, that Petitioner had been arrested in the past and was suspected of committing a crime"); *see also Murray v. Superintendent,* 651 F.2d 451, 454 (6th Cir.1981) (explaining that mugshot evidence is unfair and prejudicial because it informs the jury that the defendant has a criminal record). Indeed, even the prosecutor, who is currently a sitting federal judge, opined that showing the photographs to the jury would have raised a question of ineffective assistance of counsel. (Doc. 8-28 at 251.)

However, even if counsel had shown the original, uncropped photographs to the jury, the Court cannot conclude that all jurors would have found Freeman not guilty based on this alone. First, the photographs depict individuals with similar physical characteristics—a fact that Freeman does not dispute. The photographs all show individuals of the same general age, with similar weight, height, hair color, and facial hair. Thus, the subjects of the photographs are quite similar. It is true that the photographs are different as to other peripheral factors, but these differences in no way undermine or detract from the similarities between the physical characteristics of the individuals. Freeman relies on Dr. Dysart in arguing that the photographs are so different that the identifications are not credible, but the Court notes that the same types of differences identified by Dr. Dysart could just have easily drawn attention to the second photograph in the lineup. This

filler had on a different type of shirt and the shortest hair. This is especially true because the photographs were presented sequentially, not simultaneously, and the second photograph came before Freeman's photograph. Nonetheless, both Gobeyn and Krueger identified Freeman. Thus, the Court is unpersuaded that the differences identified by Dr. Dysart would have had the impact on the jury Freeman posits.

Second, Freeman cannot show that these photographs would have affected the jury's view of the eyewitness testimony at all, let alone by clear and convincing evidence. Despite Dr. Dysart's testimony as to the differences between Freeman's photograph and the others, even Dr. Dysart admitted that it was impossible to know if the differences between the mug shots influenced Gobeyn and Krueger's identifications. And the witnesses' testimony suggests that it would not have. Krueger's testimony demonstrated that he disregarded all external factors on the photographs but for the subject's face. He covered up the hair so that his focus was on the eyes. Thus, the differences Freeman points to, which relate entirely to the background and other peripheral factors, but not the face, would not have appeared to affect Krueger's identification. Additionally, Gobeyn's testimony was consistent throughout in that he identified Freeman on three separate occasions. So, even if the jury disregarded his initial identification, Gobeyn still identified Freeman from the in-person lineup and at trial.

Third, all witnesses had weaknesses in their credibility and testimony, which were fully explored by counsel at the time of trial, and the jury nonetheless credited their testimony. Gobeyn knew some of the individuals in the in-person lineup;[2] Krueger did not consistently identify Freeman; and Ballard never actually identified Freeman, except for maybe at trial. Yet, despite

---

[2] Although Freeman emphasizes that Gobeyn was hypnotized after the incident in an attempt to strengthen his memory, this fact is irrelevant to this analysis. The jury was not aware of this hypnosis, and so it could not have affected the jury's analysis. As such, it does not affect this Court's analysis now.

these vulnerabilities, the jury still credited the identifications and, in combination with other evidence, rejected Freeman's alibi evidence and found him guilty of the murder. It appears unlikely that the differences in the original, uncropped photographs would have completely undermined Gobeyn's and Krueger's testimony, more so than the other vulnerabilities, such that the jury would have disregarded their testimony.

Finally, even if the jury had been affected by the original, uncropped photographs, and these photographs had cast doubt upon the initial identification, both Gobeyn and Krueger independently identified Freeman at trial. The prosecutor specifically framed his questions to Gobeyn and Krueger to ask for an independent identification—asking them to consider only what they saw on the day of the murder in making the identification. Both unequivocally identified Freeman. Thus, even if the jury believed that the original, uncropped photographs tainted the initial identification, the identification at trial is separate and without any such flaw.

Indeed, under Sixth Circuit law, this independent identification is determinative. In *Keith v. Bobby*, the Sixth Circuit considered the petitioner's request to file a successive habeas petition when the petitioner offered evidence to attack the credibility of an eyewitness identification. 551 F.3d 555 (6th Cir. 2009). In that case, the petitioner was convicted of a triple murder and sentenced to death. *Id.* at 556. The state argued that petitioner was a local drug dealer indicted as a result of a police raid and that the petitioner had killed two women and a child as retaliation against a man whose cooperation facilitated the raid resulting in the petitioner's arrest. *Id.* Two victims of the shooting survived and testified at trial, and another eyewitness also connected the petitioner to the scene. *Id.* Circumstantial evidence including spent gun casings and a car the petitioner was known to drive also connected the petitioner to the scene. *Id.*

In his petition to file a second or successive habeas petition, that petitioner relied on a *Brady* evidence argument. *Id.* First, he pointed to a statement from a witness at petitioner's trial that he, not petitioner, had been offered payment to carry out the retaliation. *Id.* Second, he introduced evidence that a nurse who was incorrectly identified during police testimony (and thus could not be originally located), and who allegedly told the police that a survivor identified petitioner as the shooter, was later properly identified and supplied an affidavit that she had never heard the survivor identify the petitioner or anyone else. *Id.* The petitioner thus argued that this new evidence "undermine[d] the credibility of this police testimony and, therefore, its ability to corroborate the in-court eyewitness account provided by [the survivor]." *Id.* at 558.

The Sixth Circuit found this evidence insufficient to satisfy even the *prima facie* standard required to file a second or successive habeas petition. *Id.* The court first noted that "it is a stretch to say that the fact that another person had a motive and that an eyewitness's original identification may have occurred during a police interview and not independent of it could constitute clear and convincing evidence that no reasonable fact finder could have returned a guilty verdict." *Id.* The Court then recognized that the *prima facie* standard was "lenient," but even so, the petitioner had not made a sufficient showing because the new evidence did not contradict any evidence that directly proved the petitioner's guilt. *Id.* The Court recognized that even accepting "at full value" that someone else had a motive and that someone may have testified incorrectly as to the circumstances of an initial identification and thus would not corroborate later testimony did "not mean that no reasonable fact finder would find [petitioner] guilty." *Id*.

The Court then considered the new evidence in light of the evidence on the whole and found it to be "particularly lacking." *Id.* The Court recognized that the new evidence did not contradict any evidence of the case. *Id.* at 559. The Court noted that, at most, the evidence

introduced doubt but did not foreclose petitioner's guilt. *Id.* With regard to the identification evidence, the Court specifically noted that "even where a witness's initial identification is impliedly suspect, as Keith alleges here, our system of adjudication permits subsequent identifications on the strength of the witness's ability to observe the criminal independent of the circumstances of the first identification." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972)). The Court admitted that the new evidence made his later eyewitness testimony "marginally less credible" but disagreed that it was "a fatal blow." *Id.* The Court concluded that "[e]ven if the implication of [petitioner's] evidence is accepted, [the survivor's] in-court eyewitness testimony still strongly supports [petitioner's] guilt." *Id.*

A similar analysis applies here. Petitioner's new evidence challenges only the initial identification by Gobeyn and Krueger—only the identification made in the photographic lineup. But Gobeyn and Krueger both identified Petitioner again. Gobeyn identified Petitioner during the in-person lineup and at trial, and Krueger also identified Petitioner at trial. And the identifications made at trial were independent of the lineups. The prosecutor was careful in his questioning to limit the in-court identification to the witness's memory of the events observed on the day of the crime. Accordingly, the in-court identification was not tainted by any purported error in the photographic identification. As the *Keith* court recognized, while the challenge to the photographic lineup may cast doubt on the identification, it is not strong enough to constitute clear and convincing evidence that no reasonable juror could find Petitioner guilty. *See Keith*, 551 F.3d at 559 (citing *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) ("[T]his sort of latter-day evidence brought to impeach a prosecution witness will seldom, if ever, made a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions."))

Finally, the evidence Freeman points to is not actually exculpatory. Indeed, it does not show that Freeman is innocent at all. Instead, it relies on technicalities in the original photographs used in the photographic lineup in an attempt to impeach two separate witnesses' identification of Freeman. At most, it is impeachment evidence, but impeachment evidence is simply insufficient to satisfy the clear and convincing evidence standard. *Sawyer*, 505 U.S. at 349 ("[T]his sort of latter-day evidence brought to impeach a prosecution witness will seldom, if ever, made a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions.")

So, while the Court recognizes that the original, uncropped photographs may have cast some doubt on the strength of the original identifications, it cannot find that this evidence would, by clear and convincing evidence, have caused all jurors to find Freeman not guilty.

Freeman's arguments to the contrary fail. Importantly, Freeman asks this Court to consider evidence in addition to the original, uncropped photographs in determining whether the jury would have found him not guilty, including the "other acts" evidence, the alibi witnesses, the proffered testimony of Woodworth, and the recantation of the jailhouse informant. Indeed, much of Freeman's argument is based on the evidence that was previously presented in his first habeas petition. As set forth above, the Court's analysis is limited to only the *Brady* evidence, in addition to the evidence actually presented at trial. *Davis*, 2016 WL 8257676, at *20. Moreover, the evidence on which Freeman relies was considered and rejected by the Sixth Circuit when it reversed the district court's decision conditionally granting his first habeas petition. So, even if this Court **could** consider the evidence Freeman asks it to, it could not find such evidence indicative of a not guilty jury verdict when the Sixth Circuit previously found just the opposite.

To the extent that Freeman argues that had he had the original, uncropped photographs he would have been able to exclude Gobeyn's and Krueger's testimony because it was the result of an unduly suggestive lineup, this argument fails.

The Michigan Court of Appeals addressed this argument:

> A photo lineup is constitutionally infirm "when it is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *People v. Henry (After Remand),* 305 Mich.App 127, 160–161; 854 NW2d 114 (2014) (quotation marks and citation omitted). "The suggestiveness of a photographic lineup must be examined in light of the totality of the circumstances." *Id.* In general, a photographic lineup is not unduly suggestive if it includes some photographs that are fairly representative of a defendant's physical features and sufficient to reasonably test the identification. *People v. Kurylczyk,* 443 Mich. 289, 304; 505 NW2d 528 (1993). At the evidentiary hearing it was established that the actual photographs do not currently appear as they looked at the time of trial. In any event, a review of the copies confirms that all of the subjects are Caucasian males of roughly the same age. Each man has a moustache and mid-length darkish hair. Four of the subjects, including Freeman, are wearing plaid button-down shirts. Only one of the filler photographs depicts the subject in a dark t-shirt. All five subjects are seen with a jail placard around his neck. The photographs establish a fairly representative sampling of Freeman's physical features. Nothing in the photographs appears to single him out from the other subjects.

*Freeman*, 2015 WL 4599481, at *9.

This Court agrees. "The Supreme Court has held that an identification violates a defendant's right to due process where the identification procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification." *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005) (citing *Stovall v. Denno,* 388 U.S. 293, 301-02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). "It is the likelihood of misidentification which violates a defendant's right to due process." *Id.* (quoting *Neil,* 409 U.S. at 198).

As discussed above, and recognized by the Michigan Court of Appeals, the photographs contained individuals with similar characteristics to Freeman, and Freeman's own expert testified

that it was unknown whether the differences actually affected the identification. Thus, Freeman has not shown that the lineup was unduly suggestive, and so he has failed to show that the testimony would have been suppressed.

For all of these reasons, the Court concludes that Freeman has failed to carry his burden to establish the requirements under section 2244(B). As such, it does not reach the other procedural issues raised by Respondent or the merits of Freeman's claims.

### C.      Certificate of Appealability

A district court must decide whether a certificate of appealability ("COA") should issue when it enters a judgment adverse to a petitioner. Rules Governing 2254 Cases, Rule 11(a). A COA should issue if a petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court has rejected a petitioner's claims on the merits, the requisite substantial showing is satisfied when the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a court has denied the claims on procedural grounds, without analyzing the underlying constitutional claims, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Here, the Court will not issue a COA. Although, as noted above, the Court may have decided the merits of Freeman's case differently, Freeman did not satisfy the procedural requirements for the Court to reach the merits of his claims. Thus, the question is whether the Court finds, based on the above standard, that a COA should issue as to whether Freeman satisfied the procedural hurdle. Freeman cannot show that it is debatable whether his petition states a valid

claim of the denial of a constitutional right, as he has not shown that the photographic lineup was constitutionally defective or that the photographic lineup was material under *Brady*, nor that reasonable jurists would find it debatable whether the Court's procedural ruling is correct. Freeman simply did not satisfy the high procedural hurdles necessary for his Petition to be considered.

Therefore, this Court will not issue a COA.

### CONCLUSION

For the reasons set forth above, the Court concludes that Freeman has failed to carry his burden under section 2244(b)(ii). That is, Freeman has failed to show by clear and convincing evidence that no reasonable juror would have found him guilty if the jurors would have been presented with the original, uncropped photographs and had been able to consider that evidence along with the other evidence presented at trial. 28 U.S.C. § 2244(b)(2)(B)(ii). As such, the Court cannot consider any further procedural arguments or the merits of Freeman's claims regarding the fairness of his underlying trial. The Court's hands are simply tied.

Accordingly, **IT IS ORDERED** that Freeman's Petitioner for Writ of Habeas Corpus be, and is hereby, **DENIED WITH PREJUDICE**, and a Certificate of Appealability be **DENIED**. A separate judgment shall enter in favor of Respondent concurrently herewith.

Dated this 8th day of February, 2019.



Signed By:

*William O. Bertelsman*

United States District Judge